STATE OF LOUISIANA          *          NO. 2023-K-0252

VERSUS                      *
                                       COURT OF APPEAL
JAVAN MARSHALL AND          *
ALFRED WILLIAMS                        FOURTH CIRCUIT
                            *
                                       STATE OF LOUISIANA
                   * * * * * * *

APPLICATION FOR WRITS DIRECTED TO
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 423-496, SECTION "J"
Honorable Darryl A. Derbigny, Judge
* * * * * *
**Judge Roland L. Belsome**
* * * * * *

(Court composed of Judge Roland L. Belsome, Judge Daniel L. Dysart, Judge
Tiffany Gautier Chase)

*CHASE, J., CONCURS IN THE RESULT*

Jason R. Williams
DISTRICT ATTORNEY
Brad Scott, Chief of Appeals
District Attorney's Office
619 S. White Street
New Orleans, LA 70119

        COUNSEL FOR RELATOR/STATE OF LOUISIANA

Kevin V. Boshea
2955 Ridgelake Drive, Suite 207
Metairie, LA 70002

Mummi Ibrahim
IBRAHIM & ASSOCIATES, LLC
3157 Gentilly Blvd., Suite 2084
New Orleans, LA 70122

        COUNSEL FOR DEFENDANT/RESPONDENT - ALFRED WILLIAMS

Justin C. Harnell
H2 Law, LLC
1100 Poydras Street, Suite 2900
New Orleans, LA 70163

        COUNSEL FOR DEFENDANT/RESPONDENT - JAVAN MARSHALL

The State of Louisiana ("the State") seeks supervisory review of the trial court's March 8, 2023 ruling, which granted Defendants Javan Marshall's and Alfred Williams' Petitions for Post-Conviction Relief. In its written ruling, filed March 16, 2023, the trial court found that the Defendants received ineffective assistance of counsel under *Strickland v. Washington*, requiring a reversal of their March 7, 2002 convictions for attempted first degree murder and attempted manslaughter. After review of the record and for the reasons set forth below, this Court grants the State's writ application for supervisory review, reverses the trial court's March 8, 2023 ruling, and denies Defendants' applications for post-conviction relief.

## FACTUAL BACKGROUND

This Court's opinion on direct appeal set forth the facts adduced at Defendants' trial as follows:

On the night of May 30, 2001, the NOPD was looking for Alfred Williams pursuant to an arrest warrant. The police received information that Williams was riding in a Rollins Cab in the vicinity of Foy Street and Elysian Fields Avenue. Officers Michael Keating

1

and John Barbetti were in the area, and ordered to affect a traffic stop of the cab.

Officers Keating and Barbetti testified that they observed a cab that met the description near the Rite Aid Drug Store on Elysian Fields, and activated the lights on their marked unit. They parked the front end of their unit facing the front of the cab, and exited their vehicle. As Officer Keating approached the driver's side of the cab, he noticed that the driver was holding a gun, and ordered him to drop it. Officer Keating cautioned Officer Barbetti, who by that time was approaching the passenger side of the cab. The front seat passenger fired upon Officer Barbetti, who returned fire. Then, the driver and the rear seat passenger shot at Officer Keating, who fired back twice. As the shooting started, Officer Dan Anderson arrived on the scene, blocking the rear of the cab with his vehicle. The cab backed into Officer Anderson's vehicle, and then pulled forward, knocking Officer Keating to the ground. The suspects fled in the cab toward the river on Elysian Fields with Officer Anderson in pursuit, followed by the unit manned by Sgt. Bryan Lampard and Officer Matthew McCleary.

Ms. Diane Banks, an employee of the Rite Aid store on Foy Street and Elysian Fields Avenue, testified that on the night of the incident she was manning the cash register in the front of the store, near the door. From her vantage point, Ms. Banks saw what she described in her original statement as a dark colored car and a police vehicle drive up to the front of the store from opposite directions. Ms. Banks testified at trial that the car, a yellow cab, stopped, and she saw an arm with a gun extend from the front passenger seat of the cab and begin shooting at the police. As the police fired back, the cab backed up, and sped from the area out of Ms. Banks' line of vision.

Officer Dan Anderson testified that on the night of the incident, he responded to information concerning defendant Williams' presence in the area of the Rite Aid store on Elysian Fields near Foy Street. After Officers Keating and Barbetti stopped the cab in which Williams was riding, Officer Anderson parked his vehicle behind the cab, to thwart escape. As Officers Keating and Barbetti exited their unit, Officer Anderson saw the left front and rear doors of the cab open, and saw two suspects shooting at the police. Officers Keating and Barbetti sought cover, and exchanged gunfire with the suspects in the cab. As the shoot out began, the cab backed up, and rammed Officer Anderson's unit, then veered forward knocking down Officer

2

Keating. The cab fled toward the river on Elysian Fields Avenue. Officer Anderson activated his unit's lights and siren, and pursued the speeding cab. As the chase ensued, the front seat passenger in the cab leaned out of the window, and began to shoot at Officer Anderson. When the cab passed Pleasure Street, Officer Anderson observed the front seat passenger discard a gun, which later proved to be a 9-millimeter Beretta. Officer Anderson radioed dispatch his location, details of the chase and the discarded weapon. Sgt. Bryan Lampard and Officer Matthew McCleary joined in the chase in their marked unit. The cab failed to negotiate a turn onto a side street, hit a tree, and stalled in some shrubbery. Officers Anderson, Lampard and McCleary approached the cab on foot. Defendant Williams exited the front passenger set of the cab, and began shooting at Officers Lampard and McCleary, as he fled on foot. Officers Lampard and McCleary followed Williams in their vehicle, and apprehended him a few blocks from the crash site. Officer Anderson notified other units in the area of the foot pursuit of the fleeing suspects. Officer Anderson and other units arriving on the scene set up a perimeter of the area. In the meantime, the driver of the cab managed to free the cab from the shrubbery, and drive away. The cab crashed, however, into a police unit about a block away. Once other officers secured Williams and Marshall, Officer Anderson retraced the areas of the high-speed chase and initial confrontation to assist in securing the scenes for collection of the discarded weapons. The driver of the cab was transported to Charity Hospital.

Officer Matthew McCleary testified and corroborated Officer Anderson's testimony.

Sgt. Bryan Lampard, the task force commander of the operation to apprehend defendant Williams, testified that he received information from Detective Brazley concerning Williams' status as a wanted person and his presence in the area of Elysian Fields Avenue and Foy Street. Sgt. Lampard set up surveillance of that area. Officer Lampard and Officer Matthew McCleary were stationed at Foy and Frenchman Streets, while Officers Keating and Barbetti were across Elysian Fields at Foy Street. Officer Lampard and his team received word from undercover officers that Williams was in the area riding in a cab. Officers Lampard and McCleary drove around the block so their marked vehicle would not alert the suspect to police presence. As Officers Lampard and McCleary drove around the block, they heard gunshots. They observed Officers Keating and Barbetti engaged in a

gun battle with the suspects in the cab. Officer Lampard radioed dispatch of the situation, and joined Officer Anderson in vehicular pursuit of the cab. Sgt. Lampard's testimony of the facts of the chase corroborated Officer Anderson's testimony. Officer Lampard added that he and Officer McCleary chased Williams by car and foot, apprehending him in a neighborhood yard. Once he secured Williams and returned to the crash scene, Officer Lampard called for medical assistance for the cab driver, who had been shot.

Detective Joseph Catalanotto investigated the incident, and recovered three semi-automatic handguns discarded by the suspects-one .9 millimeter Beretta, one High Point .45-caliber and one Smith and Wesson .10 millimeter.

Officer Theresa Meunier testified that she and her partner Officer Steve Villere participated in the perimeter search of the area into which defendant Williams fled. As she and Officer Villere stood beside their vehicle parked on Benefit Street, she observed a cab approaching at an excessive rate of speed. Unable to stop, the cab crashed into the Meunier/Villere police vehicle. Officers had to break the windows of the cab to unlock the front doors to remove the two occupants. Defendant Marshall, who was seated in the back of the cab, was arrested and handcuffed. Because the driver of the cab was unconscious, and bleeding from a gunshot wound, police called for medical assistance.

*State v. Marshall*, 2002-1453, pp. 3-6 (La. App. 4 Cir. 3/19/03), 843 So.2d 469, 472–74.

## PROCEDURAL HISTORY

### *Trial*

On July 26, 2001, the Defendants were jointly indicted for five counts of attempted first degree murder. Both Defendants pled not guilty upon arraignment. At trial, Marshall was represented by Mr. Joseph Meyer, Jr., of the Orleans Parish Public Defender's Office; Williams was represented by Mr. Warren McKenna.

4

Following trial, the jury found Williams guilty as to three of the five counts of attempted first degree murder, and guilty of attempted manslaughter as to the remaining two counts via a responsive verdict.[1] Marshall was found guilty as to one count of attempted first degree murder, and one count of attempted manslaughter (the latter of which was, again, via a responsive verdict);[2] Marshall was found not guilty of two additional counts of first degree murder and the jury deadlocked on the remaining count, resulting in a mistrial on that charge and the entering of a *nolle prosequi* by the State.

### Direct Appeal

Defendants filed a joint appeal, and this Court subsequently affirmed both Defendants' convictions and sentences. *Marshall*, 2002-1453, 843 So.2d 469 (hereinafter "*Marshall I*"). Specifically, this Court held in *Marshall I* that (1) the trial court did not abuse its discretion by denying a motion for continuance when, on the morning of trial, the Defendants retained new counsel; (2) trial counsel's failure to utilize questions provided by the newly retained co-counsel was not ineffective assistance under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct.

---

[1] Williams was sentenced to fifty years imprisonment at hard labor (without the benefit of probation, parole, or suspension of sentence) for his convictions on three counts of attempted first degree murder, each to be served concurrently. Relative to his convictions on two counts of attempted manslaughter, Williams was sentenced to twenty years each, to be served concurrently with each other but consecutively to the fifty-year sentences. Williams' sentences are not at issue here.

[2] Marshall was sentenced to fifty years (without the benefit of probation, parole, or suspension of sentence) for his conviction for attempted first degree murder, and twenty years for his conviction for attempted manslaughter, to be served consecutively. The trial court denied Marshall's motions for post-verdict judgment of acquittal and reconsideration of sentence. Subsequent to his conviction and sentencing, the State filed a multiple offender bill against Marshall. Following a full hearing, the trial court adjudicated Marshall a second felony offender, vacated his twenty-year sentence for attempted manslaughter, and imposed a new sentence of fifty years, to run consecutively with his other fifty-year sentence. Marshall's sentences are not at issue here.

2052, 80 L.Ed.2d 674 (1984); and (3) Defendants' sentences were not unconstitutionally excessive.

***Post-Conviction Relief Proceedings***

Following the direct appeal, both Defendants filed *pro se* applications seeking post-conviction relief, which were supplemented numerous times, including with counseled applications. The trial court held an evidentiary hearing regarding Defendants' numerous claims over seven separate days, spanning March 8, 2019 through June 22, 2021. The court heard the testimony of seven witnesses, including: Defendants' trial counsels, the prosecutors, two police officers involved in the shooting, and – importantly to the issue currently before this Court – Mr. Renard Price (the source of NOPD's information that Williams was in a Rollins Cab in the vicinity of Foy Street and Elysian Fields Avenue on the night of the shooting). Pursuant to a *sua sponte* Order, the court also reviewed, *in camera*, the grand jury transcripts.

On December 15, 2021, the trial court issued a written ruling on the Defendants' applications. In relevant part, the 2021 ruling (1) granted Defendants' applications under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (2) denied Defendants' claims of ineffective assistance of counsel, "as previously adjudicated by the 4th Circuit Court of Appeals [sic]."

The State and both Defendants sought supervisory review with this Court. This Court consolidated the writ applications, and also ordered the trial court to produce a *per curiam* opinion describing the reasoning for granting Defendants' *Brady* claims. In its *per curiam* opinion, the trial court explained that its decision to grant the *Brady* claims rested on its review of (1) a supplemental police report

6

describing exculpatory forensic evidence[3] recovered from the taxi "which was not produced at the time of the trial" and (2) the post-conviction relief evidentiary hearing testimony of Renard Price, which the trial court found was inconsistent with the State's version of events and "led [the] Court to determine that at the time of trial, the State concealed or otherwise distorted the nature of the testimony, a material lay witness to key portions of the events in question."

This Court granted in part and denied in part the consolidated writ applications, vacated in part the trial court's ruling, and remanded the case for further proceedings. *State v. Marshall*, 2022-0145 (La. App. 4 Cir. 6/15/22), 342 So.3d 1029 (hereinafter "*Marshall II*"). Specifically, this Court found, after a careful review of the record, evidence indicating that the Defendants received the supplemental police report prior to trial,[4] and thus held that the Defendants were not entitled to post-conviction relief on that *Brady* claim. *Marshall II*, 2022-0145, at p. 24, 342 So.3d at 1045.

Regarding the testimony of Mr. Renard Price, this Court ultimately found that the State was denied the opportunity to respond to those claims, because the Defendants failed to allege a *Brady* violation on those grounds in their applications. *Id.*, 2022-0145, at p. 30, 342 So.3d at 1048. Thus, this Court vacated the trial court's ruling, and remanded that claim for briefing and argument. *Id.*

---

[3] The supplemental police report indicated the execution of a search warrant for the taxi occupied by the Defendants on the night of the shooting, and also described forensic evidence recovered from the taxi: 116 partial latent fingerprints not linked to the Defendants, negative gun powder residue tests performed on Defendants' clothes, and nine blood samples which were not linked to Defendants (because no reference was submitted for comparison to Defendants' blood).

[4] In addition to other evidence tending to show that the Defendants received the supplemental police report prior to trial, this Court found (1) that Detective Catalanotto testified at trial regarding the forensic evidence at issue; (2) that the Crime Scene Technician who seized the evidence from the taxi, was on both the State and the defense's trial witness list; and (3) that page twenty-one of the supplemental police report was introduced by Defendants at trial. *Marshall II*, 2022-0145, pp. 19-24, 342 So.3d at 1042-1045.

Finally, this Court in *Marshall II* reviewed the trial court's ruling denying Defendants' claims of ineffective assistance regarding their counsels' failure to discover Mr. Renard Price's alleged eyewitness account of the incident, and to call him to testify at trial. The trial court's December 15, 2021 ruling dismissed those claims as "previously adjudicated by the 4th Circuit Court of Appeals [sic]." However, as discussed in *Marshall II*, that ruling was erroneous, as the only ineffective assistance of counsel claims "previously adjudicated" by this Court were those related to counsels' failure to adequately cross-examine witnesses, which was held to not constitute ineffective assistance in *Marshall I*. Thus, this Court vacated the trial court's ruling dismissing those claims, and remanded the claims for further proceedings, leading to the matter currently before this Court. *Marshall II*, 2022-0145, at p. 33, 342 So.3d at 1049.[5]

On remand, the State filed a Supplemental Opposition to Defendants' applications for post-conviction relief, but neither the State, Defendant Williams, nor Defendant Marshall introduced new evidence or testimony. The trial court orally granted relief on March 8, 2023, and filed a written ruling on March 16, 2023. The trial court's written ruling found that the Defendants received ineffective assistance of counsel under *Strickland v. Washington* due to their counsels' failure to investigate and interview Mr. Renard Price.[6] The State timely

---

[5] Though not relevant to the issue currently before this Court, *Marshall II* also held that conviction for attempted manslaughter is a valid responsive verdict to the charge of attempted first degree murder, citing *State v. Harper*, 205 La. 228, 17 So.2d 260, 264 (1944), and thus denied that part of Defendant Marshall's writ application.

[6] On remand from *Marshall II*, the trial court reversed itself with regards to Defendants' claims under *Brady*, finding that "[u]pon consideration of the supplemental post conviction relief response brief filed by the state and closer review of the evidence contained in the record, most notably the fact that Renard Price's testimony did not exist at the time of trial of the defendants, and that a significant portion of the allegedly withheld police report was submitted by the

filed a notice of intent to seek supervisory review, and moved for a stay of the ruling. The trial court granted the stay, and set a return date for the State's writ application. The State's timely writ application followed.

## DISCUSSION

There is only one issue remaining before this Court: whether the Defendants' trial counsels' failure to investigate and interview Mr. Renard Price amounts to constitutionally ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Marshall II*, this Court described the testimony elicited at the post-conviction relief evidentiary hearing – which forms the basis of Defendants' ineffective assistance claims – as follows, in relevant part:

*DEFENSE WITNESSES*

*Joseph Meyer, Jr.*
Joseph Meyer Jr. testified that he served as an Orleans Parish Public Defender for thirty years, and was appointed trial counsel for Mr. Marshall for the instant case. Mr. Meyer admitted that, although he had read the trial transcripts, he had no independent recollection of the case, as he "was doing about fifty trials a year then," nor did he recall his defense strategy at trial.[7]

. . . .

*Renard Price*
Renard Price testified that he was present at the scene of the shooting. He testified that several hours prior to the shooting, he had been detained in a traffic stop for failing to use his turn signal, and was subsequently arrested for possession of stolen property after the police investigated the VIN number on the vehicle he was driving. He stated that the officer who arrested him, "Hat back Dan," also ended

---

defense as a trial exhibit, this court agrees that the record does not contain a sufficient basis for a Brady violation."

[7] Mr. Meyer testified that the extent of his substantive recollection consisted of a car chase, and "a lot of gunfire between both parties." [Footnote 4 in original opinion.]

up involved in the shooting in the instant case. Mr. Price testified that rather than transporting him to central booking, the officer took him to the Fifth District Police Station for an interview. He did not have counsel present.

According to Mr. Price, the interviewing officers had prior knowledge that he was friends with Defendants in the instant case (he stated that the officers knew they "grew up from kids together," although he did not know how the officers obtained that information), and were asking him about crimes that had occurred in the area. Mr. Price stated that the police were "coercing" him to provide information, so he began telling them things "that wasn't even much true," because he was young and "didn't know any better at that time." More specifically, Mr. Price testified that the police had agreed to let him "go free" in exchange for helpful information. He explained that the police had "just made a bust," which Mr. Price claimed to have seen with his "own two eyes," during which "two kilos of coke with $36,000" had been seized. Mr. Price testified that he was afraid the police would falsely implicate him in the narcotics seizure if he did not cooperate, so he "just went to saying 'yes' to this, 'yes' to that."[8]

Mr. Price testified that the police asked him if he could persuade Defendants to meet up with him and he replied, "Of course I can," so he was transported in an unmarked police unit by a black police officer in plain clothes to Foy Street where he used a pay phone to call Defendants.[9] Mr. Price recalled that he had phoned Mr. Williams, who agreed to meet him at a location off of Elysian Fields. Mr. Price stated that when Defendants drove past the planned meeting location, they did not see him, so they turned around and headed back toward the Rite Aid on the corner of Elysian Fields and Foy. According to Mr. Price, he had a clear view of Defendants' vehicle, and testified that he observed a police officer approach it with his gun drawn, and commanded Defendants to "stop the f-ing vehicle." Mr. Price testified that gunshots were then fired from outside the vehicle and it sped off toward I-610. The officer driving the car Mr. Price occupied pursued Defendants' vehicle to the Elysian Fields overpass "and that was that." Mr. Price recalled nothing more.

Mr. Price explained that he could observe the altercation between Defendants and the police clearly notwithstanding that it was dark out (around midnight) and he was a block away. He stated that he could hear the gunshots because the car window was "cracked." Mr. Price stated that although he could not see Defendants in the vehicle

---

[8] Later in his testimony, Mr. Price clarified that he observed the police stuffing the money and the drugs into a plastic bag at the police station, presumably to take to the evidence room. He was not present when the evidence was allegedly seized. [Footnote 5 in original opinion.]

[9] Mr. Price testified that he sat in the front passenger seat of the unmarked police car. [Footnote 6 in original opinion.]

due to the tint on the window, he knew they were inside because he was told "what [car] they were going to be in" during the phone call. Mr. Price further clarified that he observed the police fire their weapons at Defendants' vehicle, but he did not see Defendants in possession of any firearms, nor did he see any shots fired from Defendants' vehicle from his location.

Mr. Price testified that after the shooting, he was transported back to the police station, then taken to Central Lockup where he was charged with possession of a stolen automobile, although the charge was subsequently dismissed. He was never contacted by any party to testify at trial, nor did he make any effort to contact Defendants or their attorneys prior to trial.

On cross-examination, Mr. Price admitted that he had been convicted several times for possessing a stolen automobile, and he was on probation following a conviction for that offense when he was pulled over and arrested on May 31, 2001. Although the 2001 charge was ultimately dismissed, he was subsequently indicted on an unrelated charge of accessory to second degree murder, resulting in his incarceration with Defendants prior to their trial, though Mr. Price testified that he was on a different tier. Notwithstanding his admitted ability to contact Defendants in jail, Mr. Price conceded that he never notified them, their relatives, or their attorneys, that he was present at the scene and observed only the police officers firing weapons. When the district attorney asked why he had not informed his own attorney at the time, Mr. Price testified that he did, but was told that "that case [did not] have anything to do with" his own case, but they could discuss it if it "come about" in the interim.

### Warren McKenna

Warren McKenna testified that he represented Mr. Williams at trial, and that he recalled the facts of the case. . . . [Mr. McKenna testified regarding the forensic evidence described in the supplemental police report, which is not relevant to the issue currently before this Court.]

. . . .

Mr. McKenna also testified that he had never spoken to Mr. Price, nor did he "recall being given any information in regards to Mr. Price as it pertains to this matter."

. . . .

Mr. McKenna testified that the name Renard Price did not "ring a bell," and he could recall only that the police either spotted Mr. Williams at the drugstore, or received a tip that Defendants would be at the drugstore. Mr. McKenna explained that had his client

(Williams) provided "information about Mr. Price and it was exculpatory, [he] would have followed up on it," and, "presumably," would have called Mr. Price as a witness at trial. Mr. McKenna stated succinctly, "I would have talked to him if my client asked me to go speak with him."

## THE STATE WITNESSES

### Dan Anderson

NOPD Lieutenant Dan Anderson testified that he was present at the scene of the shooting and had stopped his police vehicle approximately two yards behind the vehicle Defendants were occupying. He confirmed his certainty that the front seat passenger of that vehicle initiated the gunfire. He did not recall seeing either Officer Brazley or Mr. Price at the scene, although he did recall arresting Mr. Price earlier that day. Lt. Anderson explained that he had observed Mr. Price violating "a couple of traffic laws," so he initiated a traffic stop and discovered Mr. Price had no driver's license or identification, and was driving a vehicle that had been reported stolen. He arrested Mr. Price and took him to the Fifth District Police Station. Lt. Anderson maintained that he was unaware of any friendship or relationship between Mr. Price and either of Defendants, until he later learned from Officers Brazley and Lampert that Mr. Price knew Mr. Williams. Lt. Anderson testified that he had no knowledge of a "drug bust" during which two kilos of cocaine and $36,000 were seized and he did not find Mr. Price's testimony that police officers threatened to frame him for possession of drugs to be credible.

### Calvin Brazley

NOPD Sergeant Calvin Brazley testified that his involvement in the case began when he was notified "by members of the Task Force" that a recent arrestee, Mr. Price, had information pertaining to an unrelated homicide he was investigating at the time. Sgt. Brazley stated that he spoke with Mr. Price at the Fifth District Police Station, who, it turned out, knew nothing about the murder, but could contact the suspect, Mr. Williams. Sgt. Brazley continued, "[Mr. Price] informed me that the individual was riding in a taxicab along with other individuals and they would commit armed robberies."

Sgt. Brazley testified that he rode with another officer, Todd Coleman, in an unmarked police vehicle, with Mr. Price in the backseat,[10] to a payphone near Elysian Fields and the I-610 overpass. From there, Mr. Price called Defendants, fabricated a story concerning an opportunity to commit a robbery, and directed Defendants to his

---

[10] This testimony contradicts Mr. Price's testimony that he rode in the front seat of the vehicle, accompanied by only one police officer. [Footnote 7 in original opinion.]

location. Sgt. Brazley then notified other officers in the area "to set up their positions to do the take down," and they backed the vehicle into a parking spot to wait for Defendants to arrive.[11] Sgt. Brazley recalled that when the taxicab drove by shortly thereafter, Mr. Price began "panicking in the back seat saying, "they see us," and ducked down onto the floorboard.

Sgt. Brazley testified that he, Officer Coleman, and Mr. Price then drove around the block in an attempt to follow the taxi, which had continued past them toward Frenchman Street. Sgt. Brazley saw the taxi turn onto Foy Street toward Elysian Fields and then he heard gunshots. He testified that his vehicle had not yet turned the corner onto the street where the shooting occurred so he was unable to see anything.[12] Once he heard the gunshots, he exited the vehicle and ran around the corner, but the taxicab had already fled the scene, and all he could see were police officers "ducking" and running to their vehicles. Sgt. Brazley testified that he instructed Officer Coleman, who was still driving the vehicle, to leave the scene to protect Mr. Price, and then he rode with another officer in pursuit of Defendants. At some point during the chase, Sgt. Brazley observed "an individual running on foot through the park, under the bridge toward Allen." Sgt. Brazley exited the vehicle and gave chase on foot, and "apprehended a Mr. Williams in the back of a house on Allen Street."[13]

Sgt. Brazley denied any knowledge of a drug bust in which two kilos of cocaine and $36,000 were seized, and had never seen, or had any reason to believe, that Lt. Anderson would have coerced a witness to make a false statement.

*Marshall II*, 2022-0145, at pp. 7-16, 342 So.3d at 1035-1040.

### *Ineffective Assistance of Counsel*

In 1984, the United States Supreme Court held that right to counsel guaranteed by the Sixth Amendment is the right to effective counsel. Further, the Court set forth the proper standard for judging a defendants' ineffective assistance claim:

---

[11] Sgt. Brazley specified that he was in the passenger seat, Officer Coleman was driving, and Mr. Price was in the back seat. [Footnote 8 in original opinion.]

[12] In contrast to Mr. Price's testimony that he could see the shooting clearly, Sgt. Brazley testified that from his location when the gunshots were fired, it would have been impossible for anyone in his vehicle to have seen the shooting. [Footnote 9 in original opinion.]

[13] It is not clear whether Sgt. Brazley was the arresting officer, he testified that "we" apprehended defendant. [Footnote 10 in original opinion.]

A convicted Defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the Defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the Defendant by the Sixth Amendment. Second, the Defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the Defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

Following remand from *Marshall II*, the trial court granted both Defendants relief under *Strickland*, finding that "[d]efense counsels' failure to make any contact with Mr. Renard Price . . . falls below an objective standard of reasonableness under prevailing professional norms," and that "if the jury had been allowed to hear the manner and tactics allegedly employed by NOPD to coerced [sic] Mr. Price into luring the Defendants to the Rite Aid on Elysian Fields and Foy, the decision of the jury would likely have been different in some meaningful way."

The State argues that the trial court abused its discretion in so finding, because (1) Defendants' trial counsels' conduct did not fall below an objective standard of reasonableness; and (2) Mr. Price's version of events, even if presented at trial, would not have been substantially likely to change the outcome of Defendants' trial. This Court agrees.

### *First* Strickland *Component:* **Counsels' Performance**

Under *Strickland*, judicial review of counsel's performance is highly deferential, and must include a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the Defendant must overcome the presumption that, under the circumstances, the challenged

action 'might be considered sound trial strategy.'" *Id.*, at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164 (1955)).

As previously noted by this Court, it is possible that Defendants' trial counsels "deliberately chose not to call Mr. Price as a witness because of his credibility issues, as he had been arrested for driving a stolen vehicle when he informed the police of Defendants' whereabouts, and was in jail for accessory to second degree murder at the time of Defendants' trial." *Marshall II*, 2022-0145, at pp. 29-30, 342 So.3d at 1048. Although Defendants' counsels testimony demonstrates that they remembered little of Mr. Renard Price from the time of trial over sixteen years later, the record reflects that to the extent they received information about him at all, they would have been aware that he had been arrested for driving a stolen vehicle (as reflected in the supplemental police report at issue in *Marshall II*)[14], calling his credibility into question. Even more importantly, trial counsel would have been aware from that report that Mr. Price provided the police information *against* their clients, and had assisted the police in apprehending them.[15] Thus Defendants' trial counsels, in fact, had several very good reasons *not* to call Mr. Price to testify at trial: Defendants' defense at trial was one of identity rather than justification/self-defense, and Mr. Price's testimony would have positively identified them. The Court in *Strickland* noted that

---

[14] That police report described Mr. Price's involvement as follows:

> Renard Price, black male, date of birth 08/18/1980, residing 6647 Chef Menteur [sic] Highway, home telephone 248-6530. Renard Price was arrested on Wednesday, May 30, 2001 by Fifth District Police Officers in a stolen vehicle. At the time of his arrest, Renard Price volunteered information regarding the whereabouts of Alfred Williams, who was wanted by authorities. A tape recorded statement was taken from Renard Price by Detective Dwight Deal on Thursday, May 31, 2001 at the Fifth District Police Station. After surrendering the statement Renard Price was taken to Orleans Parish Prison where he was formally charged with possession of a stolen vehicle.

[15] *See* footnote 14, *supra*.

> If counsel does not conduct a substantial investigation into each of several plausible lines of defense, assistance may nonetheless be effective. Counsel may not exclude certain lines of defense for other than strategic reasons. Limitations of time and money, however, may force early strategic choices, often based solely on conversations with the defendant and a review of the prosecution's evidence. Those strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based. Thus, when counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial. Among the factors relevant to deciding whether particular strategic choices are reasonable are the experience of the attorney, the inconsistency of unpursued and pursued lines of defense, and the potential for prejudice from taking an unpursued line of defense.

*Strickland*, 466 U.S. at 681, 104 S.Ct. at 2061.

Given the deference afforded trial counsels, this Court finds that under the totality of the circumstances, trial counsels' failure to investigate Mr. Price does not rise to constitutionally ineffective assistance requiring a reversal of Defendants' convictions. Rather, it appears most likely that it amounted to a strategic or tactical decision in the context of the counsels' limited time and resources, Mr. Price's credibility issues, and the fact that the information they received about Mr. Price indicated that he assisted the police in apprehending their clients, and could therefore positively identify them as present in the taxi on the night in question (extremely detrimental to trial counsels' identity defense at trial). Where counsel has reason to believe that investigation would be fruitless or even harmful to their defense, the choice to forgo such investigation is reasonable. *See id.*, at 691, 104 S.Ct. at 2066. While this Court acknowledges that "counsel has the duty to interview potential witnesses", *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir.1985), no evidence at trial indicated that Mr. Price was a witness to the shooting – Mr. Price's alleged account that he saw the police open fire first was a

16

surprise to all parties prior to his post-conviction relief testimony, as acknowledged by the Defendants. Thus, Mr. Price was *not* a potential witness under the facts known to counsel at the time of trial, or at least not one whose testimony could be expected to aid Defendants' trial strategy to contest identity.

### *Second* Strickland *Component: Prejudice*

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Rather, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.*, at 692, S.Ct. at 2067. Further, "[i]t is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Harrington v. Richter*, 562 U.S. 86, 104, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011) (internal quotation marks and citations omitted). "The likelihood of a different result must be substantial, not just conceivable." *Id.*, at 112, 131 S.Ct. at 792 (citation omitted).

> In *Marshall II*, this Court noted that:

> Even if the State had been aware that Mr. Price was in the vehicle with Det. Brazley at the scene, Det. Brazley's post-conviction testimony indicated that their vehicle had not yet turned the corner toward the initial location of the shootout, and thus the first shots fired would not have been visible to the occupants. He also testified that Mr. Price was afraid that Defendants would see him inside the vehicle, so he ducked down onto the floor in the backseat. Further, once shots were fired, Det. Brazley exited the vehicle and ordered Officer Williams (the driver) to return Mr. Price to the police station for his safety. . . . *On its face, this information appears neither exculpatory nor inculpatory, nor does it appear decidedly material to the defense.*

*Marshall II*, 2022-0145, p. 28-29, 342 So.3d at 1047 (emphasis added). While that finding was made in the context of exculpatory *Brady* evidence, the tests for

17

materiality under *Brady* and prejudice under *Strickland* are essentially coextensive. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068 ("the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution.").

Regardless, however, Mr. Price's testimony that he was coerced into luring the Defendants to the scene (cited in the trial court's written ruling as its grounds for relief) is immaterial to the guilt of the Defendants, and thus could not have been prejudicial to their defense. How and why the Defendants arrived on the scene was not at issue in the trial; the charges related solely to their actions thereafter in engaging in a shootout and car-chase with the police. Further, the State's opening statements made clear to the jury that the police were lying in wait for the Defendants at Elysian Fields and Foy, acting on "information that [Defendant Williams was] going to be in that area." The officers who testified at the trial also noted that they were acting on a "tip"; the jury was clearly aware that someone had 'set up' the Defendants. While we refrain from drawing any conclusions as to the truthfulness of Mr. Price's testimony that police threatened to frame him, the allegation is nevertheless irrelevant to the guilt of the Defendants regarding the crimes for which they were charged. Law enforcement frequently lures suspected criminals to a scene to effectuate their arrest, and their methods for doing so typically say nothing of the underlying guilt of the Defendants, at least where there is strong additional evidence thereof, as in the case *sub judice*.

Additionally, Mr. Price's speculative testimony that he saw the police open fire first is in direct contradiction with (1) the testimony of numerous officers present at the shooting, who unequivocally testified that the Defendants opened fire first; (2) Sgt. Calvin Brazley's testimony that Price was not in a position to be

able to see the taxi when the shooting occurred; and (3) the eyewitness testimony of Ms. Diane Banks, an employee of the Rite Aid on Elysian Fields and Foy, who testified that she saw the occupants of the taxi open fire on the police. Finally, it is doubtful that any reasonable juror would have accepted the testimony at face value, given Mr. Price's criminal history and his long-time friendship with the Defendants. It is also not apparent that Mr. Price would have offered this same testimony at the time of Defendants' trial, given that he failed to communicate it to either Defendant at the time. Given the overwhelming evidence of Defendants' guilt, it is extremely unlikely Mr. Price's version of events would have altered the outcome of the trial, particularly since the Defendants' defense at trial was one of identity, rather than justification/self-defense. Rather, it seems Mr. Price's testimony would have undermined counsels' trial strategy, and in its place offered a strategy with significant credibility and factual problems.

## CONCLUSION

For the above-stated reasons, Defendants failed to carry their burden of proving (1) that their trial counsels' failure to investigate Mr. Price amounted to constitutionally ineffective assistance of counsel; and (2) that Mr. Price's testimony, if offered at trial, would have been substantially likely to alter the outcome. Accordingly, the State's writ application for supervisory review is hereby granted, the trial court's March 16, 2023 ruling is reversed, and Defendants' applications for post-conviction relief are denied.

**WRIT GRANTED; JUDGMENT REVERSED**